Good morning. May it please the court, I'm Melissa Salinas and I'm counsel of record for Mr. Perez. I have the honor of introducing Claire Medill, who is a student with the University of Michigan Law School's Federal Appellate Litigation Clinic and we've filed the motion that has been granted for her to argue the case. Thank you. Good morning. Good morning your honors. May it please the court, my name is Claire Medill and I'm here on behalf of Appellant Alexis Perez. Before I begin, may I reserve three minutes for rebuttal? You may. Thank you. This is a case about what the police should have done, but did not. They were required to obtain a warrant that authorized the search of more than any average looking Hispanic male. They were required to arrest Mr. Perez if they wanted to continue to detain him and they were required to give him his Miranda warnings. They did none of these things. All of these omissions could have easily been avoided, but instead law enforcement consistently made choices, which violated Mr. Perez's constitutional rights. And because the trial court repeatedly applied the wrong legal standards, he permitted this unconstitutional behavior to go unchecked. You're not saying though that any John Doe warrant would be unconstitutional. And I understand this is not a John Doe, this was an alias that had minimal description, but there was also familiarity between at least one of the officers and this particular person, because they've been by. So you're not saying that according to this court in Black Dan and Wong Song is whether or not the officers can reasonably ascertain and identify the things which are authorized to be seized. And here we have possibly the best evidence that there was a particularity violation. And that's because the initial off executing officers on this case could not identify Mr. Perez as the target of the warrant. Specifically on page ID 1440, Officer Williams is asked, why did you let Mr. Perez drive away? Why didn't you stop him right away? And his answer was that the information, the quote is too general of a description to positively ID Mr. Perez as the target of the warrant. And so the only reason the officers were ultimately able to execute the warrant on Mr. Perez is because Officer Williams claimed to know what scar looked like. But as we explained in our brief, particularity is a facial requirement. And under cases such as Groh and Cabell, Officer Williams' knowledge as to whether or not Mr. Perez looked like scar is completely irrelevant. We have to look at the warrant itself and it only listed an unnamed man's race, height, weight, and hair color. It excluded very basic and easily ascertainable information, including most egregiously age. They could have stopped before. Age, how would they know his age? They could have guessed. They could say he's 20 something, 30 something, but they wouldn't know he's 23, 25. I mean, to say that you have to be particular about that, that's kind of beyond their expertise, isn't it? I'm not asking for an exact age. They should have given an approximate age. Under this warrant, what would be all right? 20 something. He's a 20 something Hispanic or would that not be particular enough? I don't know because that's not the facts of this case. The problem with this, we need to know though. I mean, if you're arguing they have to specify age, we have to set a rule. Does it have to be exact? Does it have to be in the neighborhood? I mean, what, what is the rule you want us to adopt? Probably in the neighborhood. I mean, mid twenties, mid thirties, that sort of thing. I mean, in this case, they could have stopped a 14-year-old man. They could have stopped a 75-year-old man under this warrant. And it doesn't, a warrant, yes? Do they always use warrants for searching people? We don't do that in Michigan very much. Yeah, I've never seen it in Michigan. Yeah, it is. Sorry, I didn't hear your question, your honor. Do they always require warrants for searching people? No, your honor. You are correct that it is a little unusual that they got a warrant to search a warrant. But the problem is that that is what the officers relied on to stop Mr. Perez. They relied on the warrant. In the on-page ID 1433, Officer Williams testified that he was stopped because they were executing a search warrant on his person. He was being detained to serve the warrant. And crucially, the officers did not, the officers never established probable cause to stop Mr. Perez besides the warrant. They had probable cause to stop Scar. But Officer Williams never says, I saw Mr. Perez and recognized him as Scar. He says, Mr. Perez matched the physical description in the warrant. And Officer Williams says, I know who Scar is from the controlled buys. But crucially, he never says, I saw Mr. Perez and therefore I recognized him as Scar and I could have pulled him over. So there was no probable cause to pull him over. Doesn't the particularity requirement require the search warrant to be set forth in particular? It does if it was a search warrant for a residence. The problem here is we're not challenging the search warrant for the residence. We're only challenging the search warrant for his person. And the particularity issue there is that it doesn't describe a particular person. It definitely describes a person, but the Fourth Amendment by its text requires a particular description. And there's not a particular description. Crucially, the Supreme Court has been very demanding in the area of particularity even violations that might seem minor or technical can be a reversible error. The example of this is Groh. In Groh, just like this case, the officers had enough information to put in the warrant, to make a particular warrant. But they just... What did they get as a result of this warrant from him? Yeah, they seized several items from his person, including money, cell phone, and a keys that were used against him at trial. And the resulting statements he made afterwards would also be excluded as tainted fruits of the legal stuff. Even if you prevailed on this, they would have the backup defense of good faith, would they not? No, Your Honor. The Leon good faith exception does not apply to particularity violations. In Leon itself, the court laid out four exceptions. The last one is particularity. And in Groh, this is reaffirmed by Groh, because in Groh, there was a particularity violation and they reversed without applying Leon. In almost a cursory matter, they're like, of course, Leon doesn't apply here. This is a particularity violation. And this court's jurisprudence has also recognized that. And Lazar, this court, said that if the warrant is invalid upon issuance, the Leon good faith exception does not apply. And in another case, Barados... When does it apply? It applies when the officers are acting pursuant to the reasonableness clause. As Your Honors know, there's two clauses in the Supreme... I mean, in the fourth amendment, excuse me. There's the reasonableness clause and there's the warrant clause. And the Supreme Court has drawn a hard line between those two. When officers are acting pursuant to the reasonableness clause, we're willing to give them some discretion. We're willing to let them act reasonably. But the warrant requirement is in the Constitution. It's very specific. It says you have to particularly describe, you have to get an oath. And so when you are getting the warrant itself... You're the law student. You've had the class more recent than I have. I thought Leon was a warrant case, wasn't it? Wasn't Leon the facts that the warrant itself was defective? It had something that was missing or whatever the heck it was. And they said the officers acted on reasonable belief on that defective warrant. And therefore, because they acted reasonably, even though the warrant was defective, there was no exclusion. Isn't that Leon? Your Honor, I admit that I can't remember exactly what the problem in Leon was. Yeah, that's kind of my recollection. But the... I'll quote from Leon. Leon says... Because I thought it was a warrant case. Well, a warrant case may be different than a particularity violation. Perhaps there was something deficient in the warrant. It probably wasn't particularity, but I think it concerned a warrant. Well, Leon says, and I quote, a warrant is one of the four exceptions. It says a warrant may be facially deficient, i.e. failing to particularize the place or things to be seized. They said that was an exception to the Leon requirement. And that's emphasized by Gros and by this court's recognition in Baranowski that a warrant... Read that again, please. Oh, yeah. It says... The last phrase especially. A warrant may be so facially deficient, i.e., that is, in failing to particularize the place to be searched and things to be seized. Okay. And that's an exception. That's when Leon doesn't apply. It would not be reasonable to rely on the that no reasonable officer could conclude that that warrant was legal. And here, Your Honor, no reasonable... Well, I mean, here we're saying what a reasonable officer think that this is a legal warrant. Counsel, I want to... I mean, Mr. Bedell, I want to move you now to your argument that once the police stopped and or seized Mr. Perez, that there was a problem with taking him back to the home. How does that violate his rights? He's in custody. They moved him a short distance back to the place of the search of the home. What's the problem there? The issue, Your Honor, is once officers execute a search warrant and once the execution is done, they need additional justification to move him. The problem here is that they didn't have any additional justification to move him because they didn't arrest him, and it doesn't matter that they could have arrested him. Wasn't he culturally under arrest even though the officer didn't say, you are under arrest, even though his testimony is that I didn't arrest him? The Fourth Amendment is objective. We looked at the objective elements, not the subjective elements. And looking at this objectively, isn't he objectively arrested there when he is detained, put in custody, handcuffed, everything else? I mean, isn't that the functional equivalent of an arrest? Your Honor, in our briefs we explain why we don't believe he's under arrest. Officers testified that he wasn't under arrest. There's no indication besides moving him that he's under arrest. They did the handcuffing and detaining beforehand. So I would refer you to the briefs. But with the brief time I have remaining... Excuse me, doesn't that undercut your Miranda argument, if he's not under arrest? No, it doesn't undercut our Miranda argument because the Miranda violation did occur once he was under arrest later, and the government does not dispute... When was he under arrest? Once he was at the house. That's when the officers testified that he was under arrest. You mean that's when they formally said you're under arrest? Yes. Because when you're determining whether or not an arrest has occurred, part of that is whether or not the person is free to leave. And here he has been detained, he's been handcuffed, he's been put in the back of the squad car. It's pretty clear that his freedom of movement and his will to leave have at that point been stopped. So as Judge Griffin said, there's a functional arrest at that point in time. Well, if Your Honors believe that there is a functional arrest, we still have the particularity violation and we still have the No, I'm not. Tell me what's wrong with that argument. There's nothing wrong with the argument. Our brief has already covered why this wasn't an arrest. Both legally and factually, our brief does cover that. And I'm sorry, Your Honor, I just wanted to turn to the Miranda violation quickly because government does not argue custody or that there were no Miranda violations. I mean, warnings read, the only issue we have here is interrogation. And as we explained in our brief, there was an interrogation because the officers engaged in a show and tell. And they talked to Officer and Mr. Perez about all the evidence against him despite knowing he thought he was being interrogated. But they didn't ask him any questions, did they? In fact, at one point, the officers are telling him basically to sit quiet. And he's basically voluntarily making statements. The police are not required to plug their ears when a defendant voluntarily starts talking, are they? No, Your Honor. And I see my time's almost up. Can I answer your question? Sure. In fact, you can keep answering until we tell you to stop. Okay, great. Thank you. As an additional matter, asking questions is not the only way to interrogate a person. Innis clarifies that actions and just talking can be interrogation. Now, what case is that that says actions and... Innis. It's cited in our brief and in the government's brief. Words or actions on behalf of the police that are reasonably likely to elicit an incriminating statement can be interrogation. And the problem here is that... Okay, but in the Supreme Court case where the defendant has, I've forgotten the name, but he's killed people and he's buried bodies, and the police are driving him and they say something like, you know, it's too bad that we're not going to be able to, that her parents aren't gonna be able to give her a proper burial. I believe you're referring to Nix. Yes. Okay. So was that an interrogation? They found it was an interrogation. It was a little different because that was a Mosiah violation, which is after your right to counsel has attached. The right to counsel hadn't attached yet, but they still found an interrogation there. The problem here is that the officers took actions and they talked to Mr. Perez. They did talk to Mr. Perez. There's testimony that they talked to him at the house and in the car. And they did this despite knowing, as a trial court found, that Mr. Perez was susceptible to interrogation. And despite the fact that Mr. Perez said to Officer Lees, I think you're interviewing me and I do not want to cooperate. On that point, all he had to do was read the four Miranda warnings and this argument would be moot and we wouldn't be having this discussion. But he decided not to. Okay. Now, what exactly did they do that you say was the equivalent of interrogation? I mean, I know the cases you're talking about, you can find interrogation even though they didn't ask a specific question. But what exactly did they do that you say is interrogation? Yes. There are two things. The first thing they did that was interrogation is they moved him from the porch where he was being detained perfectly fine. You can move people. Yes. Yes, Your Honor. You can move people. But in Ennis, the court said if officers take an action with the purpose of obtaining incriminating statements. Purpose? Yes. Their purpose is what we look at as opposed to their actions? Well, you look at their actions. But the Supreme Court said if they're taking actions and there's no explanation besides a desire to obtain incriminating statements, they said this in Ennis and Munez, then that can be interrogation. I want to interject a kind of common sense thing. If the police officers have an individual on the porch and they're going inside to search, they're not likely to leave the individual out on the porch while they all go inside. I mean, so so I mean, we can't just say just because they moved him from the porch inside that that would be a violation. I agree with Your Honor, but that's not what happened here. There were more than enough officers. They were doing the search already when they got there and they had officers holding him out. Furthermore, Officer Lees testified that he was basically doing nothing. So there was no reason he couldn't have stayed out on the porch with Mr. Perez. And crucially, the government, the officers are pushed on why they moved Mr. Perez and they can't come up with an explanation. They just say, oh, it's our practice. It's our protocol. We just always move them to the incriminating evidence. In other words, we always do the show and tell. And I think it's it's also crucial that the government in its response brief never rebuts our argument that there's no explanation for moving Mr. Perez beyond a desire to obtain incriminating statements. There was no officer safety issue because there were enough officers. And Mr. Perez actually became more unsafe when he was moved into the kitchen. They didn't need him to. Well, on the on the porch, officers testified that he was being fine and he was being nice and polite. And then when he was moved into the kitchen, Officer Lees testified that he became belligerent and they had to remove him from the scene. And that's when he moved to the car. And that's when the second interrogation occurred. And that and you asked me, what did the officers do? There it was. The interrogation was because Mr. Perez said, I think I'm being interviewed and I don't want to cooperate. And then Officer Lees talked to him and said, we have conclusive evidence of your guilt. You're going to jail for a long time. We know, in fact, that you're dealing in heroin. At this point, those statements he should have known, especially given that Mr. Perez had already given a statement, he should have known that Mr. Perez was likely, as the court said, to trial court found likely to blurt out anything. And the Miranda warnings were required. Didn't the courts suppress some of the statements? He did. There were four statements. The trial court suppressed the last statement, which was in an interrogation room. But there was here there was an entire, entire process failure. The government was constantly moving Mr. Perez around, constantly talking to him for a long period of time on Lake Drive, in the house, on the porch, in the car, in the interrogation room. And their position is that under at no point in that time were the officers on notice that they should have given him his Miranda warnings. But the first part of that, when you said in the car, moving him around and so on, you've already told us that he wasn't under arrest. He wasn't under arrest on Lake Drive. He was under arrest at the house. Yes, I understand your argument, but. Oh, there were two car rides. There was the car ride from Lake Drive to the house where we are arguing he wasn't under arrest. But then at the house, he was under arrest. And then there was a car ride after that. And the government does not does not argue that he wasn't in custody. They've conceded custody and lack of Miranda. So the only issue is interrogation. So if he's under arrest at the house after he gets to the house. Does the inevitable discovery rule come into play that even if that first search lacked particularity and so on, they would have inevitably discovered it when they searched him when they arrested him at the house? No, Your Honor, because if this first warrant, if the warrant was invalid, then they wouldn't have obtained the items on his person. And without the items on his person, they did not have probable cause to arrest him. The only reason they had probable cause was because they found the money, keys and phone on his person. So at that point, if the warrant is invalid, they should have just let him go and he wouldn't he could not be placed under arrest and they wouldn't have discovered his statements. OK. All right. This is a deal. You've got two other issues. I'll give you a couple of minutes if you want to just have a briefly or do you want to rely on your brain? Well, actually, I just want I want to ask one more clarifying question. So so there were there was a warrant for his person, right? And a warrant for the house. There were two warrants. You're not you're not challenging one warrant in a combined form. OK, but you're not challenging the portion that relates to the house, the portion that relates to the person. Yes. Thank you. Oh, you want to touch on? Yeah. Are you referring to just rely on your brief? I'll give you a couple. Oh, yeah. I'm willing to rely on our brief on our Sixth Amendment issue. With regards to the honey, the honeymoon issue, Officer Honeyman testified for over 10 pages about how Mr. Perez was associated with violent gangs in Youngstown, including he he talked about murder. He said that one of the the gang that issue in this conspiracy had murdered someone. And he made all of these statements for 10 pages. We are arguing that under 404 and 403, that was plain error because you can see there was no objection to their. Yes, we can see that there was no objection, unlike the warrant. All right. What this this was background information, was it not, as to how he came to know Mr. Perez and how, you know, how he came to his attention, isn't it? No, Your Honor, because in this court, under cases such as Colmer and a couple other cases in our brief that I can't remember off the top of my head, this court takes a very narrow view of background information. It must the court does not take a complete the story. And this court has specifically rejected more overly broad background information views of other sister circuits. And it must be necessary to telling the story and inextricably intertwined with the issues, with the issues at case. Here, Mr. Perez was only on trial for drug related offenses. All Officer Honeyman needed to say is, I work at this this violent crimes unit. I was listening to wiretaps related to a drug story and I and related to drugs. And I heard Mr. Perez on the wiretaps. There was absolutely no reason he needed to say 12 times, I only investigate violent people. These people are violent. These people are in a gang. And there's no way that the murder, which he was not on trial for, that there's no there's no indication that Mr. Perez was even involved in the murder. There was no reason he needed to bring that up here. Also, there was a limiting instruction given by the trial judge. Right? No, your honor. It's not a limiting instruction because a limiting instruction clarifies the permissible purposes and the non permissible purposes of the evidence that what he said said neither of those things. It did not say you may use this information for background information, but not to infer that he is a bad person and therefore must be guilty. The trial court never said that. He just said, ladies and gentlemen, this is a drug case. That's basically essentially what he said. Why would he say that if it's not in disregard this information for purposes of this or that? I don't know. Was there an objection to the the instruction, limited instruction, a cautionary instruction, whatever you want to call it? Was there an objection to the form of it? No, there was no objection to the form of it. But because it's evidence that the U.S. attorney emphasized the the violent gang aspect in closing argument or anything else. No, your honor. I mean, is there any other prejudice other than the testimony of the officer? No, it's just the testimony which was prolonged and repeated. And if there's no objection to the the testimony and no objection to the instruction, are we supposed to evaluate the degree of of of prejudice in determining whether or not it was so prejudicial as to undermine the the fairness of the trial process? Yes, it is under plain error and that is the standard whether it undermined the fairness of the trial process. The problem here is that we have when you think of bad character evidence in your head, what is the worst thing you could think of? It's possibly he murdered someone. And that's what we have admitted here. We have testimony from an officer saying Mr. Prez was involved in a murder that's not related to anything. And though they did not emphasize the murder, the person who was murdered, his name was Andre Whitmore. And he was mentioned in closing. I don't remember what in context. So it was a brief reminder of the jury. Hey, by the way, Mr. Prez is linked to this murder of Andre. All right. Any further questions? Thank you, Your Honor. You'll have your rebuttal. Oh, thank you. Good morning. Good morning. May it please the court. My name is Dan Ricci. I represent the government on this appeal. Initially, the question really is whether the search warrant for Perez, the body Before you get to that, let's do the last issue discussed. Why is it relevant? Any of this stuff about gangs? It was really, Honeyman was really just testifying how he became involved in this investigation. The investigation is not relevant to the guilt or innocence, is it? It's right. I mean, under your theory, you could go back and show what school Honeyman went to. And, you know, he grew up, he wanted to be a policeman, or he wanted to be a drug dealer, whatever he wanted to be. That's just not relevant. How is it relevant that there was gang involvement here? Because that's what Honeyman does. There's two different units that were involved in this investigation. One was the Mahoning Valley Violent Crimes Task Force, and there was a drug task force. Honeyman came upon Perez while he was investigating, doing his investigation on the Violent Crimes Task Force. So what? And and it was just to show the jury, here's what, you know, here's the background information to how he found about Perez in the Title Three. He was listening to a Title Three electronic recording. And if he had never said, I'm sorry, if he had found out about it, listen to NPR and finding out that Perez had won the Nobel Prize, would you have introduced it? It probably not. Yeah. But he never said Perez was. One thing that I think is significant is he never said Perez was in a gang. He never said Perez was involved in a murder. He never, all he said was Perez was selling drugs. You're just arguing against yourself, because if he's not involved in the murder, not in this, not in that, it becomes less relevant. Which is why the district court then, when the agent kind of unsolicited, started to talk about more than just the background information, the court said, wait a minute. And the court didn't just say, wait, this is just a drug case. The court said, we're not here for gangs. We're not here for violence. We're here because this is a heroin distribution case. And the court limited it right there. Which is probably your best argument. And there was no reason to do anything further in the final jury instructions, because that would just emphasize the gang aspect of this case, which there was no gang aspect. Prior to that, there was no objection. And the trial judge did a sua sponte, didn't he? Yes, there was no objection, and there was no request for a further instruction. You know, what's the trial judge supposed to do? You know. Well, Ms. Medill says that there was nine pages of transcript about this violence and gang and all of this and murder. And so you give an instruction that never tells the jury to disregard this. You make some statements about we're here for drugs, we're here for trial or whatever. But clearly that testimony was introduced to sort of pain the minds of the jury that this is a violent person involved with gang activity, they're dangerous. Even though there was no objection, you all, I mean, the government didn't try to rein in that witness. Well, the government didn't. You may not have asked the question, but you know, anytime a witness is getting beyond where you want them to go, you sort of rein them back in yourself to keep them on track. And I'm not saying you had an obligation to make an objection, I'm just talking about the reality of nine pages of trial testimony about an issue that Ms. Medill says is highly prejudicial and the judge gives some kind of instruction but never tells the jury to disregard that, never tells them what purpose that can be heard. You cannot ring the bell. No, but it's also, you know, the testimony was that Alexis was selling drugs to people in Youngstown, to gang members in Youngstown. Not that he was involved in the gang, but that those were his customers. I mean, that's really why it came in. And did it go farther afield than it should have? Yes. And as soon as it did, the judge stopped it. And then the prosecutor did not, you know, argue it in closing, the prosecutor immediately went on to then, what do these recordings say? And under these circumstances, I don't think it rises to the level of plain error. And it was never, with the cautionary instruction, the court never struck the testimony, correct? No. But really, the question is, does that rise to the level of plain error? And I don't think under these circumstances that it does. To go back to the search warrant initially, the body warrant for Perez, it does describe, it put the information in there that the government had. It described Scar, that's the only name they knew him by, 5'10", Hispanic male with black hair. Granted, that's not, you know, that's what they had. You can't put in there more than what you have. They had to know his relative age, didn't they? That he's in 20s or 30s or, I mean, they say this could be a warrant for a 15-year-old or an 80-year-old. I mean, there's no age at all. There is no age at all. But as you brought out in the appellant's argument, how do you do that? Well, I mean, I think in the neighborhood would be good. All right, so you're missing age. What did they also argue? You're missing eye color. Eye color is not always easy to determine, particularly from a distance. What else did they want? Well, what they also had, though, is him connected to the house, coming from the house. They saw him on the day of the arrest. Law enforcement, police officers see him leave the house. What was his nickname? Scar. Why was he named Scar? I don't know. I'm assuming he had some type of pretty identifying scar on his face, but I don't know for sure. Going back to this particularity issue and what you have just shared with us, Ms. Medill says that could describe pretty much any Hispanic male because we don't have any age parameters. We don't have any color parameters. Hispanic, that is a very broad term. Is it somebody from Cuba? Is it somebody from Mexico? I mean, when we get in pre-sentence reports, we always have some other kind of character, descriptive information in there. There was nothing here. So in addition to no age indications, nothing else. So how can that be all the description you had? Isn't that, by its nature, overly broad and nondescriptive? I think it's what they had, and then in conjunction with the house, watching someone with that description leave the house, drive away from the house, go to the drive-through and come back to the house. They already had a warrant for the house? Yes. So if they had executed that warrant while he was in the house, would there be any question that even without a warrant they could search him for their own protection? Well, it was a combined warrant for the person. No, no, forget the warrant now, other than it allows them to search the house. Oh, if they didn't have a warrant for Perez, you mean? Yeah. No, that would come under Bailey. I mean, that would be the Bailey case where the Supreme Court dealt with an issue where someone that was not even a resident of an apartment left the premises. They saw him leave. He got a mile away. They pulled him over and stopped him. They had no probable cause to do any of that, and then they brought him back to the house. No, no. Here, the difference. I'm sorry, Your Honor. Go ahead. The hypothetical, and it's not based on this record, is it's not what happened in this record. If they had executed the warrant while he was in the house, before he left the house, and they didn't have to move him back to the house, would we even be here talking about it? I don't think so. Okay. I don't think so. Getting back to the particularity of the description, I mean, you also have that he's 5'10 and 185 pounds with black hair, right? Yes. I mean, I think that's kind of what saved you, that if you just had his name and he's Hispanic, I would think that would not be particular enough because you could round up that he – well, you also have a sex. He's a male Hispanic, so you've got his sex, his race, although I question whether Hispanic is actually a race, but it's considered one, I guess. I think it's actually a language. And you've got his height, weight, and color of hair. I mean, so you've got really everything except his age and his eye color, I guess. I don't know what else you've got. I don't know all of it. And you're saying, you know, having 1, 2, 3, 4, 5, 6, 6 out of 8 is good enough, basically. In conjunction with watching him leave the house and then watching him return to the house. Yeah. You say it was actually – the officer thought he was fleeing from the house because he went to the house and then kind of turned around and went the other way or something. The officer testified that he thought he took kind of an evasive turn when he saw law enforcement at the house conducting the search. Okay. And that's when they decided to pull him over. It's also significant that this case really is distinguishable from Groh on a number of levels. Groh, the search warrant itself, actually the Supreme Court, I think, described it as nonsensical or you couldn't even tell. It said, you know, we're going to search the premises for and then it had a description of the house. A blue two-story frame house. So the court looks at that and they're like, look, this doesn't even make sense. You know, any officer – and that's why good faith didn't apply in Groh because the court said any officer that looks at this just on its face knows that it doesn't make sense. Concealed on the property is a house is basically what the warrant said in Groh. Here the warrant listed SCAR, listed the house, it listed the cell phone number, and the cell phone number was pretty significant in this case. It's the cell phone that they used to do the control buys. When they executed the search warrant, the body warrant on Mr. Perez, they found keys, money, and the cell phone. The keys and the money really don't mean that much. But they dialed the cell phone and it rang. They had some confirmation. Right, and that gives them probable cause at that point to detain him, which is what they did. Yes, there was one officer that testified. No, he wasn't under arrest, but he wasn't free to leave. Let me just ask you this too. When they stopped him on Lake Drive, how far away from the house had he gotten when he stopped? Did the record say whether he was a mile away, half mile away? I don't think it did. But he wasn't very far from the house. No, because he was returning to the house. Right. He returned, he saw law enforcement, he left, they got him, and they took him back to the house. So technically he was still pretty much in the vicinity, I guess, of the house at the time of the stop. He was close. I mean, I don't think under Michigan v. Summers he was probably in that, you know, they talk about. I mean, I don't mean to suggest that he was on the curtilage or anything like that. He was clearly away from the house, but he wasn't all that far from the house. No, he was on his way back. And once that cell phone rang, that's important. And this wasn't like a Riley thing where they're going into the cell phone. You know, they just dialed the cell phone number that they knew and his phone rang. And at that point they have probable cause to take him into custody. And then once they have probable cause, they can detain him where they want. They don't have to detain him. There's no requirement that they immediately take him to jail. There's no requirement that they, you know, they can bring him back to the house and detain him at the house once they have probable cause. And the cell phone gave them probable cause. Okay, and they can take him back to the house and interrogate him. Are you relying on a particular case or just on policy positions or police protocol? Well, they didn't interrogate him. But I just want to know what you're relying on when you make that statement because Ms. Baddiel clearly disagrees with you. Well, I know she does. So is there a case that you're relying on? I can't think of one off the top of my head. I think there's one in the brief, but I can't think of it off the top of my head. Does it matter where he's in custody? Well, that's, you know, once the probable, and that is, that's the probable cause. And that's the difference with Bailey too. You know, as to the Miranda issue, if it's inherently coercive, the location that they put him, and I guess that might be the issue when they take him from the house to the station, they put him in a room that they say, I guess, is used for interrogation maybe, but they didn't interrogate him. Well, that's the, that was the part. Are you talking about the, once they get to the headquarters? Yeah. Okay. No, they didn't interrogate him. Although the judge, ultimately one officer leaves when Al told another officer, hey, this guy might be willing to cooperate. That officer goes in, and then that's the part that Judge Oliver found was coercive and suppressed, and suppressed that part. But the other, the other, the other parts they found, you know, and we don't, Perez's counsel's right, we don't, we don't dispute there was custody, but we do dispute interrogation. There was no, they didn't ask any questions. Anything that was said was a response to his question. At one point, Officer Lees actually said, I wish you would, it would be better if you just remained silent until we got to the headquarters. Even after he said that, Perez kept, you know, asking questions, and there's no problem, there's no constitutional requirement that the officer doesn't have to, you know, respond to those questions, even in a very basic way. If there are no further questions. Thank you, Your Honor. Thank you. A rebuttal. First, Your Honors, I asked what else they could have put in the warrant that they didn't. I want to point out that they had Scarr's address, his cell phone, and his cell phone number is Carr. None of that was in the warrant itself. It was either in the search warrant affidavit, which Grosz says is irrelevant, or it was in the warrant for the resident, not for Scarr. It never says that was Scarr's cell phone or connected to Scarr. The Carr is not mentioned at all. All right, the cell phone number is in the warrant. It's for the residential component, and it never says that that's Scarr's cell phone number. It's not making anything more particular for why the officers could have arrested him. Okay, the cell phone number and a cellular telephone, this is the search warrant, and so they're authorized to seize the cellular telephone having the number 6465622502. That's not Scarr's cell phone? It is Scarr's cell phone number, but it's not in the personal aspect of the search warrant. The point is here, would that have helped them identify Scarr? And it wouldn't have because it doesn't say that's Scarr's cell phone. If you find a man with that cell phone, you can pull him over. Well, this is a combined search warrant, which is unusual because I really don't see this in Michigan. It lists the search of the person and has the identification of Scarr, and then it has the place, and then it has a paragraph. It is now concealed. There is now concealed a person or property, namely, and then they list what they're looking for. I mean, I read that as pertaining both to the person and to the place. You don't? No, Your Honor, I do not because the description never says that there's a person. This is a warrant that's trying to be a warrant that says you can search 221 Glenwood Avenue residence and you can search a person in between, but it doesn't do that. It never says Scarr is inside the house, that he's connected to the house, that's his house. And most crucially, they didn't stop him and search him pursuant to the warrant under the house. And the government in the suppression hearing refers to it as essentially two separate warrants that just happen to be on the same sheet of paper, and in the government's brief, they never say that the warrant itself connects Scarr to the residence or connects Mr. Perez to the residence. They only say that the affidavit does it. The affidavit says that Scarr lived at the house. You also asked what else could have been in the warrant. There was no age, facial hair, no skin tone, no hair length. They could have attached a picture. We're not saying they always have to, but they could have attached a picture, and there's no reason they could have said Scarr will be identified as identified by Officer Williams. I've seen warrants that say that too that didn't say that. The only reason the officers were able to execute the warrant in this case was because Officer Williams was called in to identify Mr. Perez as Scarr. And as we stated, that's irrelevant under Gros and Cabell. As I stated before on page ID 1440, the officer testifies, yeah, this warrant was so general we didn't know if Mr. Perez was the person who was in the warrant, so we let this purported dangerous drug dealer drive away. He was so dangerous they were investigating him from 2009? Yes. For four years or three years, whatever? Yes. They investigated him in 2009 and then again in 2013. Also, I wanted to just quickly point out that although Gros did evolve a warrant that was completely devoid of a description, the Supreme Court never limited its holding to that. None of the facts or analysis were limited to that. Gros was about how particularity is a facial requirement, and that warrant was not facially valid. Furthermore, the Fourth Amendment requires a warrant, as I said before, to particularly describe the persons and items, not just to describe. So in Gros there was a description failure, but here there's a particularity failure. And finally, if your honors have any more questions about the Miranda issue, as we said, we're not arguing that anytime they move a suspect for safety reasons that there's interrogation. The problem here is that they moved him with no purpose besides obtaining and incriminating evidence. They were doing a show and tell. They put him at the table with the incriminating evidence. They talked to him. That has the force of the question saying, is this yours? And not surprisingly, he said he made statements. Any further questions? Thank you, Your Honor. We ask you to reverse enter ban for new trial. Thank you. I do want to compliment the University of Michigan Law School Federal Appellate Litigation Clinic for their work on the case, and also Ms. McDill for doing an excellent job in the case representing your clients. Thank you for your representation. Case is submitted.